# In the United States Court of Federal Claims

No. 09-690C

(Filed: August 1, 2012)

*****************************************

| | |
|---|---|
| SUGAR HILL, LLC, | * FEMA Lease Following Hurricanes |
| | * Katrina and Rita; Dual Burden to |
| | * Recover Repair or Restoration |
| Plaintiff, | * Costs; Federal Rule of Evidence |
| | * 702; Unreliability of Expert |
| v. | * Testimony; Lost Profits Claim; |
| | * Independent and Collateral |
| THE UNITED STATES, | * Undertakings Doctrine; Speculative |
| | * and Unsupported Damages. |
| Defendant. | * |

*****************************************

*Emmett J. Boudreaux*, Baton Rouge, Louisiana, for Plaintiff.

*Corinne A. Niosi*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Kirk Manhardt*, Assistant Director, and *David A. Harrington*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case concerns a lease between Plaintiff, Sugar Hill, LLC ("Sugar Hill") and the Federal Emergency Management Agency ("FEMA") for mobile home trailer pads in Convent, Louisiana following Hurricanes Katrina and Rita in 2005. Sugar Hill alleges that FEMA breached the lease agreement, and claims damages of approximately $3.6 million in repair costs and lost profits. The Court held a three-day trial in Baton Rouge, Louisiana on January 24-26, 2012. Thereafter, the Court received post-trial briefs, and heard closing argument in Washington, D.C. on June 11, 2012. For the reasons explained below, the Court concludes that Sugar Hill failed to show entitlement to any damages. The Court will dismiss the complaint and enter judgment for the Government.

Background[1]

A. Sugar Hill, LLC and Convent Mobile Home Park

Sugar Hill is a limited liability company established on January 5, 2006 and organized under the laws of Louisiana. JSOF ¶ 1.[2]  Sugar Hill has two members: (i) Mr. Mark Anderson and (ii) Sunrise Partners, LLC. Id. ¶ 4.  Mr. Anderson is the majority shareholder and managing member. Anderson, Tr. 194.

Between January 5 and February 14, 2006, Sugar Hill purchased three adjoining, undeveloped parcels of land in Convent, Louisiana (St. James Parish), which Sugar Hill combined and named "Convent Mobile Home Park." JSOF ¶¶ 2-3, 6; Anderson, Tr. 45-47.  Sugar Hill specifically purchased the parcels comprising the park for lease to FEMA in the aftermath of Hurricanes Katrina and Rita. See Lavkold, Tr. 555-56.

Sugar Hill purchased the three parcels at fair market value, for a total acquisition cost of $239,050. Id. at 558-59.  Including land acquisition, Sugar Hill's aggregate cost to develop the park was $1.5 million. McClellan, Tr. 649-51.

The park consists of 161 individual pads for mobile home trailers. See JX 8.  Two private roads run through the park: Sugar Hill Street and Cut Cane Drive. See id.  One row of pads runs along Cut Cane Drive, sequentially numbered 1-51. See id.  Additional rows of pads run along either side of Sugar Hill Street. See id.  The pads on one side are numbered 52-103, and the pads on the other side are numbered 104-159. See id.  Pads 160-161 are located on Cut Cane Drive at its intersection with Sugar Hill Street. See id.

---

[1]  This Background section comprises the Court's principal findings of fact under Court Rule 52(a). Other findings of fact and rulings on mixed questions of fact and law are set forth later in the Discussion.

[2]  Citations to the record in this case are as follows:  (i) Sugar Hill's October 13, 2009 complaint (Docket No. 1); (ii) the parties' January 5, 2012 stipulations of fact ("JSOF") (Docket No. 38); (iii) Sugar Hill's January 5, 2012  pre-trial proposed conclusions of law (Docket No. 46); (iv) the parties' April 5, 2012 post-trial briefs (Docket Nos. 77 and 78); (v) Sugar Hill's proposed findings of fact ("PPFOF"), found at pages 3-5 of Plaintiff's post-trial brief (Docket No. 78);  (vi) the parties' May 7, 2012 post-trial response briefs (Docket Nos. 79 and 80); (vii) trial transcript citations are to the witness and page number at the Baton Rouge trial; (viii) closing argument citations are designated as "Closing Args." in a parenthetical; (ix) trial exhibit citations are to "JX __" for joint exhibits, "PX__" for Sugar Hill's exhibits, and "DX__" for Government exhibits.

B.  Provisions of Sugar Hill's Lease Agreement With FEMA

FEMA is a component of the U.S. Department of Homeland Security.  JSOF ¶ 5.
Sugar Hill leased all 161 pads at the park to FEMA on April 1, 2006, for sublease as
mobile home pads to persons displaced by the two hurricanes.  Id. ¶¶ 6-9.  At the time
Sugar Hill entered into the lease with FEMA, Mr. Anderson had no definitive plans for
use of the park following the lease term.  See Anderson, Tr. 51-52, 156, 214-15.

Originally, the parties agreed that FEMA would rent 134 full-sized pads at
$800/pad/month, see JX 1 (unit pad lease of pads 1-2, 16-37, and 52-161), and 27 smaller
"park model" or "RV" pads at $725/pad/month, see JX 2 (unit pad lease of pads 3-15 and
38-51).  JSOF ¶¶ 6-7, 11.  These rental prices amounted to almost double the prevailing
market rate.  See Lavkold, Tr. 566; Tatje, Tr. 658-59.  The lease term originally ran from
April 24, 2006 to April 23, 2007.  JSOF ¶ 12; see also JX 3 (fixed price purchase order
incorporating the two unit pad leases).

Under the lease, Sugar Hill agreed (i) "to provide and maintain all water, sanitary
sewage, electrical, [and] other utilit[y] connections provided on the site at the time of
execution;" and (ii) "to maintain the leased Pad[s] and premises in good repair."  JX 1, at
¶¶ 2, 7 (emphasis omitted); JX 2 (same).

For its part, FEMA agreed (i) "to keep said [l]eased Pad[s] and premises in a clean
and orderly condition;" (ii) "to surrender the same [in] as good a state and condition as at
the commencement of the term hereof, reasonable use, wear and tear thereof excepted;"
and (iii) to "return the personal property and the premises in the condition existing at the
time of entry, reasonable use, wear and tear excepted."  JX 1, at ¶¶ 7-8; JX 2 (same).

C.  Lease Activation

Prior to the commencement of the lease term, Sugar Hill installed subsurface main
sewer and water trunk lines at the park, in addition to electrical lines to meter boxes
serving the 161 individual pads.  JSOF ¶ 15.  Sugar Hill also installed a 50-amp electrical
conduit along Cut Cane Drive to pads 1-51, which was sufficient to service only smaller
RV pads.  PPFOF ¶ 10.

Thereafter, FEMA contractors installed subsurface lateral sewer and water lines
from the main trunk lines to the individual mobile homes, in addition to electrical
conduits from the meter boxes to the individual mobile homes.  JSOF ¶ 17.  FEMA
supplied, and its contractors installed, the physical mobile home units.  Id. ¶ 16.

D.  <u>Lease Modifications and Deactivation</u>

The parties modified the lease at various times between January 16, 2007 and January 8, 2008.  <u>See id.</u> ¶¶ 13-14, 18-23.

On January 16, 2007, the parties modified the lease, retroactive to the beginning of its term, for Sugar Hill to provide all 161 Lots as full-sized pads at the $800 monthly rental rate.  <u>Id.</u> ¶ 14; <u>see also</u> Lease Modification, No. P00001.  "FEMA took the expense of increasing the amperage" so that the 27 smaller pads could provide adequate electrical service to full-sized mobile homes.  DX 4; <u>see also</u> PX 36; Anderson, Tr. 72-73.

On May 16, 2007, the parties extended the lease term by six months, for all 161 mobile home pads, to October 23, 2007.  JSOF ¶ 18; <u>see also</u> Lease Modification, No. P00002.  On September 24, 2007, the parties reduced the lease term for 22 mobile home pads to October 1, 2007, and extended the lease term for the remaining 139 mobile home pads by another six months to April 23, 2008.  <u>Id.</u> ¶ 19; <u>see also</u> Lease Modification, No. P00003.

On November 27, 2007, FEMA notified Sugar Hill by letter that it would be terminating the lease of 39 mobile home pads effective December 1, 2007.  <u>Id.</u> ¶ 21.  On December 21, 2007, FEMA notified Sugar Hill by letter that it would be terminating the lease of another 19 mobile home pads effective January 1, 2008.  <u>Id.</u> ¶ 22.  On January 8, 2008, FEMA notified Sugar Hill that it would be terminating the lease of all remaining mobile home pads effective February 29, 2008.  <u>Id.</u> ¶ 23.

FEMA contractors deactivated and physically removed the mobile home units from the park.  <u>Id.</u> ¶ 26.  The contractors left in-ground the subsurface lateral sewer and water lines, in addition to the electrical conduits from the meter boxes to the individual pads.  <u>Id.</u> ¶ 27.

FEMA did not remove the last mobile home unit from the park until March 19, 2008.  <u>Id.</u> ¶ 24.  However, it paid additional rent for the February 29, 2008 to March 19, 2008 period.  <u>Id.</u>  In sum, FEMA paid Sugar Hill $2,800,160 in rent for the overall modified lease term of April 24, 2006 to March 19, 2008.  <u>Id.</u> ¶ 25.

E.  <u>Sugar Hill's Finances at the Time of Deactivation</u>

Sugar Hill distributed approximately $600,000 in retained earnings to Mr. Anderson and Sunrise Partners, LLC in 2006.  <u>Id.</u> ¶ 58.  It distributed $993,000 in retained earnings in 2007, and $166,700 in retained earnings in 2008.  <u>Id.</u> ¶¶ 59-60.  In all, Mr. Anderson and Sunrise Partners, LLC accrued approximately $1,759,700 in dividends from Sugar Hill between 2006 and 2008.

At the end of 2009, Sugar Hill had approximately $1.2 million in owners' equity. McClellan, Tr. 650.

F. <u>Conversion of Full-Sized Mobile Home Pads to Smaller RV Pads After Deactivation</u>

Sugar Hill "began work in early 2009" to convert Lots 1-50 to accommodate smaller RV, rather than full-sized mobile home, service.   PPFOF ¶ 25.   The park experienced the following rental history between April 30, 2009 and April 30, 2011 for the converted RV pads (all occupancy rates are rounded to the nearest whole percentage):

| Month | Pads Rented | Pads Available | Occupancy Rate |
|---|---|---|---|
| April 30, 2009 | 15 | 20 | 75% |
| May 31, 2009 | 17 | 25 | 68% |
| June 30, 2009 | 34 | 35 | 97% |
| July 31, 2009 | 43 | 44 | 98% |
| August 31, 2009 | 44 | 44 | 100% |
| September 30, 2009 | 38 | 44 | 86% |
| October 31, 2009 | 42 | 44 | 95% |
| November 30, 2009 | 28 | 44 | 64% |
| December 31, 2009 | 23 | 44 | 52% |
| January 31, 2010 | 44 | 44 | 100% |
| February 28, 2010 | 44 | 44 | 100% |
| March 31, 2010 | 19 | 44 | 43% |
| April 30, 2010 | 4 | 44 | 9% |
| May 31, 2010 | 3 | 44 | 7% |
| June 30, 2010 | 2 | 44 | 5% |
| July 31. 2010 | 1 | 44 | 2% |
| August 31, 2010 | 7 | 50 | 16% |
| September 30, 2010 | 9 | 50 | 18% |
| October 31, 2010 | 12 | 50 | 24% |
| November 30, 2010 | 9 | 50 | 18% |
| December 31, 2010 | 17 | 50 | 34% |
| January 31, 2011 | 22 | 50 | 44% |
| February 28, 2011 | 26 | 50 | 52% |
| March 31, 2011 | 31 | 50 | 62% |
| April 30, 2011 | 29 | 50 | 58% |

JSOF ¶¶ 28-56.  Sugar Hill has not converted the remaining 111 pads.  <u>Id.</u> ¶ 57.

<u>Procedural History and Summary of Sugar Hill's Claims</u>

Presently, Sugar Hill is before the Court seeking damages of approximately $3.6 million for FEMA's alleged breach of the parties' lease.  Sugar Hill claims that FEMA breached the lease by damaging the park during lease activation and deactivation, causing Sugar Hill to suffer repair costs and lost profits.[3]

A.  <u>Sugar Hill's Repair Cost Allegations</u>

1.  <u>Costs Relating to Lease Activation</u>

Sugar Hill alleges that, during the process of physically installing the mobile homes, FEMA contractors trenched through (i) the preexisting 50-amp electrical conduit to pads 1-51, as well as (ii) their own lateral sewer and water lines.  PPFOF ¶¶ 10-11. Furthermore, Sugar Hill alleges (iii) FEMA contractors installed the lateral sewer and water lines "in a haphazard, non-conforming and non-workmanlike manner," and that (iv) Sugar Hill incurred expenses during the lease term to repair the park's infrastructure, "including trenched or cut sewer lines and damage to the sewer treatment pump."  <u>Id.</u> ¶¶ 13-14.

2.  <u>Costs Relating to Lease Deactivation</u>

Sugar Hill alleges that, during the deactivation process, FEMA contractors damaged the park's surface infrastructure, including "electrical gear and panels," traffic signs, water valve boxes, and the fence surrounding the park's sewer treatment plant.  <u>Id.</u> ¶ 17.  <u>But see</u> Anderson, Tr. 269 (conceding that Sugar Hill had not replaced the traffic signs in over four years).

Additionally, Sugar Hill alleges that the contractors, over its objections, "removed $1941.00 worth of concrete stepping stones" from the premises.  PPFOF ¶ 18.  <u>But see</u> Anderson, Tr. 269-70 (suggesting that he has not yet pinpointed how many of the missing stepping stones actually are attributable to FEMA or its contractors).

Finally, Sugar Hill alleges that the contractors damaged subsurface water lines when physically removing the mobile home units, causing leaks which increased the park's average water bills.  Anderson, Tr. 119-23; <u>see also</u> PX 17 (monthly water bills from St. James Parish Utilities).  <u>But see</u> Anderson, Tr. 120 (blaming water leaks on residents running over lines with their cars), 121 (discussing *pre*-deactivation water bill

---

[3] In its October 13, 2009 complaint, Sugar Hill failed to enumerate its specific allegations of wrongdoing by FEMA.  Thus, the Court has had to piece together Sugar Hill's allegations from the various filings and the trial transcript.  Sugar Hill's repair cost allegations roughly correspond with paragraphs 7, 8, 10, 12, 13, 14, and 16 of the complaint, and the lost profits allegations roughly correspond with paragraphs 9, 11, and 17 of the complaint.

increases).  Sugar Hill contends that "*all* lateral water and sewer lines remaining in ground at the park must be removed and replaced before those pads can be rented to the public."  PPFOF ¶ 21 (emphasis added).

In all, Sugar Hill maintains that, after FEMA vacated on March 19, 2008, "the park was unusable due to the damages caused by FEMA and its contractors."  Id. ¶ 19.

### 3.  Costs of Converting to RV Pads

Upon the expiration of its lease with FEMA, Sugar Hill decided to convert the park from a facility catering to full-sized mobile homes to a facility that could accommodate smaller RVs.  See *supra* Background, Part F.

To convert Lots 1-50, Sugar Hill alleges that it "paid to have 50-amp electrical conduits replaced at those lots."  PPFOF ¶ 20.  But see Anderson, Tr. 254-57 (conceding that Sugar Hill did not remove the entire FEMA contractor-installed 50-amp conduit). Sugar Hill seeks to recover its cost to replace the conduits to Lots 1-50.

Additionally, Sugar Hill alleges that it "removed and replaced all water and/or sewer lines" at Lots 1-50.  PPFOF ¶ 20.  Mr. Anderson testified that he replaced those utility lines, to relocate them to the back of each Lot, to make "it very easy for an RV to back in and make a hook-up."  Anderson, Tr. 266.  Sugar Hill is claiming its cost to replace those lines.

After replacing the utility lines, Mr. Anderson "had to grade the property."  Id. Sugar Hill is claiming its grading costs.

Mr. Anderson ultimately converted Lots 1-50 to "top-of-the-line spaces" with concrete, rather than dirt and limestone, pads.  Anderson, Tr. 264, 266-67.  Sugar Hill is claiming its concrete paving costs.

To serve the remaining 111 Lots, Mr. Anderson "bought some [adjacent] FEMA cottages and remodeled them . . . into an office, a store, a laundry room, and a shower house" because, "if you're renting to grunt workers on grass sites, you better have a shower house."  Id. at 268.  Also, Mr. Anderson began installing cable television service at the park, and plans to provide Internet access at a future date.  See id. at 269.  Sugar Hill is claiming the cost of installing all of these amenities.

### B.  Sugar Hill's Lost Profits Allegations

Sugar Hill alleges that the above damages pertaining to lease activation and deactivation delayed its conversion of Lots 1-50 from full-sized mobile home pads to smaller RV pads.  Additionally, Sugar Hill alleges that the above damages prevented it

from converting the remaining 111 Lots. In support of this theory, Sugar Hill relies on a report by its finance expert, Mr. Jeffrey Aucoin, and an appraisal by its real estate valuation expert, Mr. David Lavkold.

Specifically, Sugar Hill alleges that FEMA and its contractors rendered the park "unsafe and unfit for occupancy and intended use." Compl. at 4 ¶ 9. Sugar Hill asserts that, due to "the extensive and unconscionable damages sustained" during FEMA's lease of the park, it "is still unable to lease large parts of the Convent Mobile Home Park, and [its] losses are ongoing." Id. at 6-7 ¶ 17. Thus, Sugar Hill argues that the Government is liable to it for damages, "including loss of use and loss of profits, increased construction cost and increased cost of borrowing, and for its failure to properly train, administer, and supervise." Id.

C. Sugar Hill's Claims to the Contracting Officer

On June 27, 2008, Sugar Hill submitted a non-certified claim for $1,165,098.10 and, on July 8, 2008, a certified claim for $856,284.80, "for reimbursement for repairs or upgrades." Compl. Ex. A, at 2. FEMA's contracting officer rejected Sugar Hill's claims, for failure to submit "proof of payments . . . to support" them. Id. On August 11, 2008, Sugar Hill submitted another certified claim, "for reimbursement of upgrades, repair work, removal, and clean-up" at the park. Id. FEMA's contracting officer rejected this claim as well, for failure "to produce the necessary documentation," such as "cancelled checks or bank statements to support" it. Id.

On November 7, 2008, Sugar Hill submitted four new certified claims, totaling $1,129,940.08, "for reimbursement for the cost of repairs, debris removal, grading, electrical upgrades and additional water usage." Id. at 1; see also Compl. Ex. B (Claim Nos. 0551-54). In a final decision dated February 25, 2009, FEMA's contracting officer found Sugar Hill was entitled to $4,845.43, and that the "other claims denied at this time are within the scope of the signed lease agreement for which Sugar Hill [already] was paid per pad per month." Id. at 3.

D. Proceedings Before This Court

Sugar Hill filed suit in this Court on October 13, 2009, alleging that:

(i)     FEMA's contracting officer "has arbitrarily and capriciously denied Plaintiff's well-documented claims;" and

(ii)    FEMA "is in breach of its obligation of good faith and fair dealing under the terms of the contract of lease in that it has, *inter alia*, failed to make full and timely payment for the leased pads its trailers occupied at Convent Mobile Home Park."

Compl. at 6 ¶ 16.

Sugar Hill is claiming:

(i)        $906,531.75 for "repair of damages to Plaintiff's property" and $197,613.33 for "amounts due under terms of lease" (collectively "repair costs");

(ii)       $2.5 million for "loss of use" and lost profits (collectively "lost profits");[4]

(iii)      attorney's fees; and

(iv)      interest.

Id. at 7 ¶¶ a-c, e-f.

Pertinent Trial Testimony

A.  Mr. Mark Maher

Mr. Anderson contacted an engineering consulting firm, Glenn Shaheen & Associates ("Shaheen") in early February of 2008, "to perform a cost and damage estimate" at the park.  Maher, Tr. 335.  Shaheen assigned a project manager, Mr. Mark Maher, to Mr. Anderson's account.  Id. at 333, 335.  Sugar Hill called Mr. Maher at trial as a fact witness.  See id. at 332, 334.

Shaheen previously had "helped Mr. Anderson with the initial layout and development" of the park, and Mr. Anderson already had retained Shaheen "to help convert" the park to RV service.  Id. at 370-71.  However, Mr. Maher had not been directly involved in those other projects.  Id. at 371.

Mr. Anderson expressed to Mr. Maher "that he was not happy with the way the mobile home park, Sugar Hill, was left after the removal of the majority of the mobile homes, and that he wanted us to visit the site, do an evaluation, prepare a report and forward it to him."  Id. at 336; see also DX 20 (Mr. Maher's initial report, dated Mar. 17, 2008); DX 37 (update to Mr. Maher's report, dated Apr. 21, 2008).

When Mr. Maher first visited the park, to evaluate the grounds and prepare his report, only 31 FEMA mobile homes remained.  Id. at 371.  He was not present for the actual removal of any of the units.  Id. at 372.  Mr. Maher inspected the surface

---

[4] Notwithstanding this $2.5 million figure in its complaint, Sugar Hill's finance expert, Mr. Aucoin, testified at trial that Sugar Hill sustained "approximately $350,000" in lost profits.  Aucoin, Tr. 487; see also Pl.'s Br. (Apr. 5, 2012), at 20 (using Mr. Aucoin's $350,000 estimate).

conditions of the park, but did not inspect the subsurface conditions.  Id. at 373.  He observed no sinkholes.  See id. at 375-76.

According to Mr. Maher, lateral sewer and water lines had to be cut, and then capped, to disconnect them from the mobile homes prior to their removal.  Id. at 378.  At the time of his inspection, 102 of the 162 total sewer lines were capped.  Id. at 379.[5]  While Mr. Maher did not observe every water line, of those he did observe, all but eight either were capped or had valves that could be shut off from above ground.  Id. at 378-79.

B.  Mr. Thomas Warder III

From January 2007 through March 19, 2008, Mr. Thomas Warder III served as a FEMA contracting officer's technical representative ("COTR") on maintenance and deactivation contracts pertaining to Sugar Hill's park.  Warder, Tr. 606-08.  The Government called Mr. Warder at trial as a fact witness.  See id. at 606.

Mr. Warder testified that the grounds were "in good condition" when he first visited the park in early 2007.  Id. at 610.  He specifically recalled that "the grass was kept.  There were a couple dumpsters that were in regular intervals for the [residents] to use.  The roads were in good condition. . . .  [I]t was a nice looking park."  Id.

However, Mr. Warder noted that, over time, "the grass was left uncut.  Trees would fall down, and they weren't removed.  The driveways and aggregate, they just eroded away and were just left in the condition they were."  Id. at 611.  In the park's drainage ditches and culverts, Mr. Warder observed grass, debris, and driveway aggregate.  Id.  Mr. Warder made these observations before the start of the lease deactivation process.  Id. at 612.

Mr. Warder visited the park in March 2008, "to perform a final inspection . . . after all the units had been removed."  Id. at 621.  That day, "the grounds were overgrown."  Id.  "It . . . didn't look like anybody had been in the park in well over a month to do any kind of maintenance whatsoever.  The grass hadn't even been cut."  Id.  There was enough household garbage on the Lots to "fill[] up a small . . . truck," but there were no dumpsters on the grounds.  Id. at 623-25.

According to Mr. Warder, the lateral sewer lines, for the most part, were in working condition throughout the lease term and at the time the lease expired.  Id. at 612.  If the lines had been in need of repair, he would have known about it.  Id. at 613.  Mr. Warder testified that only two lateral sewer lines needed repairs over the course of the

---

[5] The "162" figure includes the main sewer trunk line, in addition to the 161 lateral sewer lines running to the individual pads.

lease.  See id. at 614-16.  FEMA contractors fixed one, and plumbers working for Sugar Hill fixed the other.  Id.

Mr. Warder also recalled "approximately a couple dozen" water leaks, which the park's residents "generally caused."  Id. at 617.  FEMA contractors fixed all but one of the leaks, which was "in an area where" Sugar Hill, rather than FEMA, "would have been responsible."  Id. at 617-18.

C.  Mr. Louis Jackson

Mr. Louis Jackson is "a registered civil engineer in the state of Louisiana" with "a little over 15 years" of experience.  Jackson, Tr. 635.  The Government called Mr. Jackson as a witness, see id. at 634, and the Court qualified him "as an expert in civil engineering and in water and sewer infrastructure."  Tr., 637.

According to Mr. Jackson, in the event a trenching machine cut a lateral sewer or water line, it "would become broken, with a hole in the pipe, four to six inches." Jackson, Tr. 638.  A "sewer line that's been hit by a trenching machine with a [four to six-inch] hole in it . . . would have made itself evident."  Id. at 639.  The hole "would undoubtedly allow the soil around the underground pipe into the line," in most cases causing "a back-up in the system which would have an effect on the ability of sewage to leave the housing unit."  Id.  Thus, "if a lateral sewer line continued to work for the two years FEMA was leasing" the park, "that would be an indication that there wasn't any significant problem with the line."  Id. at 640.

Similarly, in the event of a trenched water line, "water service would be effectively terminated at that point.  There would be no water getting through to the housing unit."  Id. at 638.  Therefore, the problem would have "become immediately evident to any occupant."  Id.

D.  Mr. Jeffrey Aucoin

Mr. Jeffrey Aucoin is a Certified Public Accountant ("CPA") with undergraduate and graduate degrees in accounting from Louisiana State University, and secondary certifications in financial forensics, internal auditing, and fraud examination.  Aucoin, Tr. 453-55.  Sugar Hill called Mr. Aucoin as a witness, see id. at 453, and the Court qualified him "as an expert in the field of accounting, finance, and lost profits."  Tr. 457; Aucoin, Tr. 486-87; see also PX 47 (Mr. Aucoin's report).  However, as noted below, the Court ultimately rejected Mr. Aucoin's testimony.

### 1.  Mr. Aucoin Was Unqualified to Determine the Occupancy Rates Used in His Report.

Hypothetical occupancy rates for Sugar Hill's park are essential to Mr. Aucoin's lost profits calculations.  See Aucoin, Tr. 461-63.  Mr. Aucoin personally derived the occupancy rates used in his expert report.  Id. at 462.  However, Mr. Aucoin is a CPA by trade, and is not licensed to appraise real estate.  Id. at 457.  Mr. Aucoin performs no regular work with the Uniform Standards of Professional Appraisal Practice ("USPAP"), and did not know whether his expert report even comported with them.  Id. at 458.

### 2.  Mr. Aucoin Relied upon Unsound Appraisal Methodology.

Mr. Aucoin did not utilize his accounting expertise to derive occupancy rates.  Id. at 463.  Instead, he relied largely upon "tally sheets" from an adjoining RV park at the Lamar Dixon Expo Center ("Expo Center") in Gonzales, Louisiana.  Id. at 466-67, 469.  However, unlike Convent Mobile Home Park, which is a private mobile home facility, the Expo Center is a public special-events venue, which is located near Interstate I-10 and various shopping malls.  Id. at 467.

The Expo Center's tally sheets did not break down the adjoining RV park's day-to-day or month-to-month occupancy rates.  Id. at 471-73.  Thus, Mr. Aucoin did not use the tally sheets to calculate the actual occupancy rates at the RV park.  See id. at 472-73, 478-79, 502-03, 519-21.  Rather, he simply used the tally sheets to identify whether any persons rented pads for more than 30 days at a time.  Id. at 472-73, 502-03.

Mr. Aucoin did not interview anyone who actually rented at either Sugar Hill's park or the Expo Center.  Id. at 469, 515.  He failed to interview a single Expo Center employee.  Id. at 519-20.  Mr. Aucoin never has operated or managed an RV park and, therefore, has limited personal knowledge of the RV park business.  See id. at 459-60.

Additionally, Mr. Aucoin relied upon the presence of a large refining project by the Marathon Petroleum Corporation ("Marathon"), fifteen to twenty miles away in neighboring St. John the Baptist Parish, as an event that would drive demand for RV housing at Convent Mobile Home Park to house "temporary workers."  Id. at 517-19; see also Lavkold, Tr. 585.  However, the Marathon project commenced in 2007, prior to the expiration of Sugar Hill's lease to FEMA.  Id. at 518; see also Lavkold, Tr. 585.  Under Mr. Aucoin's analysis, Sugar Hill would have had to convert immediately from full-sized FEMA to smaller RV pads, and Marathon workers would have had to be indifferent both (i) to living in neighboring St. James Parish and (ii) to the inconvenience of relocating.  See id. at 517-19.

### 3. Mr. Aucoin's Derived Occupancy Rates Conflict with Sugar Hill's Stipulated Occupancy Rates.

Finally, yet significantly, Mr. Aucoin was unaware that the parties had entered into pre-trial stipulations of fact, including stipulated occupancy rates. Id. at 473-74; see also supra Background, Part F (rental history for the converted RV pads). Indeed, his hypothetical occupancy rates are contrary to the parties' stipulated data. Id. at 476. Mr. Aucoin's assumed occupancy rates often exceed Sugar Hill's stipulated rates by large margins. Id. at 476-77; see also id. at 495-505.

### E. Mr. Eric McClellan

Mr. Eric McClellan is a "senior economist" with over 23 years of experience "developing and reviewing" financial statements, and producing "complex financial analyses," including evaluations of "the economic and financial stability of airports, roads, highways, ports, rail facilities," and other associated infrastructures. McClellan, Tr. 647. The Government called Mr. McClellan as a witness, see id. at 646, and the Court qualified him "as an expert in the area of economics and financial analysis." Tr., 648.

In the opinion of Mr. McClellan, Sugar Hill had sufficient capital, or access to capital, in 2008, to convert all 161 full-sized mobile home pads to smaller RV pads if market conditions had warranted. McClellan, Tr. 649-51.

### F. Mr. David Lavkold

Mr. David Lavkold is a Louisiana state-certified real estate appraiser with approximately 25 years of experience appraising residential and commercial properties, including "several mobile home parks throughout the southern part" of Louisiana. Lavkold, Tr. 526-28. Sugar Hill called Mr. Lavkold as a witness, see id. at 526, and the Court qualified him "as an expert on real estate valuation." Tr. 529-30; see also PX 49 (Mr. Lavkold's appraisal).

Mr. Lavkold offered opinions concerning the value of Sugar Hill's park at two distinct points in time. See Lavkold, Tr. 531-32. Mr. Lavkold's first opinion concerned the park's "day-in" value at the time that Sugar Hill's lease with FEMA commenced. Id. at 554. His second opinion concerned the park's "day-out" value at the time that Sugar Hill's lease to FEMA expired. Id. Mr. Lavkold prepared both opinions as "retrospective,"[6] rather than "hypothetical,"[7] appraisals. Id. at 555; see also PX 49, at 18.

---

[6] A retrospective appraisal or valuation is limited to a specified date. Lavkold, Tr. 532-33. Looking back in time, an appraiser may have knowledge of market conditions occurring after the valuation. Id. However, the appraiser may not consider those market conditions. Id. The appraiser is limited only to the information that would have been available to a typical buyer or seller on the specified date. Id.

There are three generally accepted methods for valuing real estate: (i) the cost approach; (ii) the sales approach; and (iii) the income approach. Id. at 557. Mr. Lavkold limited his analysis solely to the income approach. Id. at 562. To prepare his day-in and day-out appraisals, Mr. Lavkold used a discounted cash flow valuation model, one of several accepted methods for performing an income approach valuation. Id. at 562-63. Mr. Lavkold made "extraordinary assumptions" in completing his appraisal. Id. at 536-37, 570.[8]

For the reasons noted below, the Court ultimately rejected Mr. Lavkold's appraisal as unreliable.

One of Mr. Lavkold's extraordinary assumptions was that "curative costs" of $710,000 were appropriate and accurate. Id. at 570; see also PX 49 at 6, 18. Sugar Hill's counsel provided Mr. Lavkold with this $710,000 figure. Id. Mr. Lavkold did not independently verify the curative costs, and concedes that he would have been unqualified to do so. Id. at 570-71.

Additionally, Mr. Lavkold made an extraordinary assumption to rely on Mr. Aucoin's discount, market rent, and occupancy rates. Id. at 537; see also PX 47 (Mr. Aucoin's report). Mr. Lavkold did so upon Sugar Hill's "instruction." Id.

Finally, Mr. Lavkold conceded that he did not have sufficient time to perform an analysis of the actual market demand for RV pads within the vicinity of Sugar Hill's park. See id. at 572-75. Thus, he did not investigate whether any workers from the Marathon project ever actually rented at the park. Id. at 585.

Similarly, Mr. Lavkold conceded that he would have preferred at least 40 hours to prepare his analysis of the park's "highest and best use" but, instead, spent only five to

---

[7]   In a hypothetical appraisal or valuation, the appraiser may value the property, for purposes of comparison, by assuming a hypothetical condition. See PX 49, at 18.

[8] An extraordinary assumption is:

> An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions.

> Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the identified property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in the analysis, USPAP, 2010 edition.

PX 49, at 17.

eight hours.  Id. at 574-75; see also PX 49 Supplement (Mr. Lavkold's "highest and best use" analysis).[9]

G. Mr. Henry Tatje III

Mr. Henry Tatje III is a "real estate appraiser by trade," who also is "heavily involved in brokerage, property management," and real estate investment.  Tatje, Tr. 652. He has "been in the real estate appraisal business since 1976," and "actively involved in the brokerage business since about 1994."  Id. at 653.  Mr. Tatje has prepared "many" retrospective appraisals, including "well over a hundred" since Hurricane Katrina.  Id. at 655.  In August 2008, he "personally brokered" the purchase "of an RV park which had been a former FEMA trailer park."  Id.  The Government called Mr. Tatje as a witness, see id. at 652, and the Court qualified him "as an expert in the field of real estate appraisals, real estate investments, and real estate brokerage."  Tr. 656-57.

On November 17, 2011, Mr. Tatje provided Government counsel with an expert report reviewing the work product of two of Plaintiffs' expert witnesses: Mr. Aucoin and Mr. Lavkold.  DX 58 (Mr. Tatje's report); see also PX 47 (Mr. Aucoin's report), PX 49 (Mr. Lavkold's appraisal).  Mr. Tatje reviewed Mr. Lavkold's appraisal as to its technical compliance with the USPAP and as to the accuracy of its substantive conclusions.  Tatje, Tr. 657.  He reviewed Mr. Aucoin's report because "a large portion" of Mr. Lavkold's conclusions were dependent upon it.  Id.

Mr. Tatje identified "a number of flaws" in Mr. Lavkold's appraisal, which the Court summarizes below.  Id. at 658; see also DX 58, at 4-6.

1. Mr. Lavkold Improperly Valued Sugar Hill's Day-In Property Interest As a "Leased Fee" with a 30-Month Term.

First, Mr. Lavkold valued Sugar Hill's day-in property interest in the park as a "leased fee."  DX 58, at 6; see also PX 49, at 6.  However, Mr. Lavkold characterized Sugar Hill's day-out property interest in the park as a "fee simple."  PX 49, at 6.[10]  In Mr. Tatje's opinion, comparing the day-in appraisal as a leased-fee, with the day-out appraisal as a fee simple, resulted in a significant overstatement of the change in value because

---

[9] Remarkably, Mr. Lavkold concluded that the park's highest and best use would have been to remain vacant and undeveloped.  Lavkold, Tr. 575.  He further concluded that, as improved, the park's highest and best use would be to hold constant at 50 the number of pads converted for RV service.  Id. at 579-81; see also id. at 575-78.

[10] In his report, Mr. Lavkold characterized Sugar Hill's interest in the park at both day-in and day-out as a "fee simple."  However, "when you look at the calculations and the way they're made, it's obvious that [day-in] is a leased-fee valuation."  Tatje, Tr. 658-59; see also Lavkold, Tr. 564-65, 675-76 (conceding that he characterized Sugar Hill's day-in interest as a leased fee).

FEMA leased the park at almost double the prevailing market rate.  Tatje, Tr. 658-59; <u>see also</u> Lavkold, Tr. 564-66.

Mr. Lavkold compounded this error by using a 30-month lease term to value the day-in leased fee.  <u>See</u> Lavkold, Tr. 565.  This number had no factual basis, as the lease ran for twelve months as originally executed, and for approximately 23 months as modified.  <u>See</u> <i>supra</i> Background, Parts B, D.  Regardless, in a retrospective appraisal of a day-in value, where the appraiser must ignore knowledge of subsequent lease modifications, only the 12-month as-executed number would have been proper to use. Tatje, Tr. 659; <u>see also</u> Lavkold, Tr. 569.

These overstatements led Mr. Lavkold to reach a day-in valuation of $2,605,000. PX 49, at 6; <u>see also</u> Lavkold, Tr. 558-59.  Mr. Lavkold made that valuation on April 4, 2006, which was only seven weeks after Sugar Hill completed its purchase of the three parcels comprising the park, at fair market value, for $239,050.  Lavkold, Tr. 558-59; <u>see also</u> JSOF ¶¶ 2-3, 6; Anderson, Tr. 45-47.  Thus, Mr. Lavkold remarkably concluded that the park appreciated in value by roughly 990% over its first seven weeks of existence.

    2.  <u>Mr. Lavkold Improperly Relied on Discount, Market Rent, and Occupancy Rates from Mr. Aucoin, Who Is Not a Licensed Appraiser of Real Estate.</u>

Second, Mr. Tatje critiqued Mr. Lavkold's extraordinary assumption to rely on the discount, market rent, and occupancy rates from Mr. Aucoin's report:

> [T]he only methodology that [Mr. Lavkold] used in his appraisal was an income approach, and the primary aspects of developing an income approach are the estimates of market rent, estimates of occupancy, and estimates of a reasonable capitalization or discount rate that you would use in the report.
>
> If someone has given those, why would you even need to hire an appraiser?  You could have just had a mathematician do the mathematical calculations.  I think he has abdicated his responsibility as an appraiser to someone else to do work which is typically under the purview of an appraiser.  We do that all the time, Your Honor.  We estimate market rent.  We estimate occupancies, and we estimate an appropriate discount rate to be used.

Tatje, Tr. 660; <u>see also</u> DX 58, at 4-6.

Mr. Tatje testified he "could find no information" in Mr. Aucoin's report that "would be to the standards that USPAP or any reasonable peer or reader would want to use to justify the conclusions." Id. at 661.  He added that Mr. Aucoin "had not only no support up to the [USPAP] standards, but had no support at all for his conclusions of market rent, occupancy rates, and a discount rate applicable to a real estate appraisal." Id.

   3.   Mr. Lavkold Improperly Relied on Mr. Aucoin's Flawed Occupancy Rates.

Finally, Mr. Tatje specifically criticized Mr. Lavkold's reliance, in preparing his day-out valuation, on Mr. Aucoin's occupancy rates.  See id. at 661-62.  Mr. Tatje questioned Mr. Aucoin's projection of 90 percent occupancy at the Park "into perpetuity" and commented that, "if you're going to use someone else's report, you need to at least use some test of reasonableness."  Id.  He noted that:

> The community of Convent only has about 2,000 people.  If you assume a 90 percent occupancy [at a] 161-unit RV park, and you just assume that one person is living in each RV, you will increase the population of Convent by 7 percent.  Convent's population hasn't increased by a total of 7 percent in probably 30 or 40 years.

Id. at 662.  Indeed, St. James Parish has experienced little to no growth over the past half-century.  Lavkold, Tr. 576, 581-82.

## Discussion

A.  Sugar Hill's Repair Costs

   1.   The Governing Law

It is incumbent upon a plaintiff-lessor, "to establish by a preponderance of the evidence that the fair market value of [property] in the condition in which [a defendant-lessee] had covenanted to restore it, [would be] greater than its fair market value in an unrestored state at the termination of the lease."  Dodge St. Bldg. Corp. v. United States, 341 F.2d 641, 645 (Ct. Cl. 1965) (internal citation omitted).  "Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages."  Id. at 644 (internal citation omitted).  "Furthermore, if the fair market value of the property is greater in its unrestored condition than it would be if restored in accordance with the covenants of the lease contract, the lessor has sustained no damage and is entitled to recover nothing."  Id. (internal citation omitted).  This rule from Dodge

Street "is equally applicable to" both "repair" and "restoration" costs. <u>Mo. Baptist Hosp.</u> <u>v. United States</u>, 555 F.2d 290, 302 (Ct. Cl. 1977).[11]

In sum, a plaintiff-lessor "bears a dual burden" to show (i) what the cost of repair or restoration is; and (ii) thereafter, that "the diminution in fair market value," which operates as an "absolute ceiling" on recovery, exceeds the cost of repair or restoration. <u>Id.</u> at 296 (internal footnote omitted); <u>Dodge Street</u>, 341 F.2d at 645. Where the plaintiff fails to satisfy this dual burden "by a preponderance of the evidence" it, consequently, must lose "on insufficiency of evidence." <u>Mo. Baptist</u>, 555 F.2d at 296; <u>Dodge Street</u>, 341 F.2d at 645.

Since the purpose of this rule "is to avoid windfall recoveries," <u>Mo. Baptist</u>, 555 F.2d at 294, the plaintiff-lessor also must present evidence that the defendant-lessee, and not some other factor, was the proximate cause of the diminution in value, <u>see id.</u> at 295.

### 2. Sugar Hill Presented No Relevant or Reliable Evidence That the Park Has Diminished in Value.

Sugar Hill proffered Mr. Lavkold's appraisal as its sole evidence that the park has diminished in value. <u>See</u> PX 49. However, upon consideration of the trial record, the Court finds that Mr. Lavkold's appraisal is irrelevant to the question of diminution in value. Moreover, Mr. Lavkold's appraisal is unreliable under Federal Rule of Evidence 702.

### a. Mr. Lavkold's Appraisal Is Irrelevant under *Dodge Street*.

Under <u>Dodge Street</u>, a plaintiff must compare the cost of repair or restoration with the alleged diminution in value. Here, Sugar Hill's appraisal expert, Mr. Lavkold, conceded that he performed no hypothetical appraisal, which would have compared the park's day-out value with its hypothetical repaired or restored value. Lavkold, Tr. 555. Rather, he performed a purely retrospective appraisal, comparing only the park's day-in and day-out values. <u>Id.</u> For this reason alone, Mr. Lavkold's appraisal cannot satisfy Sugar Hill's <u>Dodge Street</u> burden. It simply is irrelevant to the question of diminution in value.

### b. Regardless, Mr. Lavkold's Appraisal Is Unreliable.

Moreover, under the Federal Rules of Evidence, an expert witness may testify only if the expert's "testimony is the product of reliable principles and methods," and "the

---

[11] Sugar Hill stipulated to the applicability of <u>Dodge Street</u> in paragraph 6 of its pre-trial proposed conclusions of law.

expert has reliably applied [those] principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d).

Here, Mr. Tatje identified many flaws in Mr. Lavkold's appraisal. Those flaws included Mr. Lavkold's (i) valuation of Sugar Hill's day-in property interest as a leased fee; (ii) use of a 30-month lease term; (iii) reliance on the discount, market rent, and occupancy rates of a non-appraiser; and (iv) reliance on Mr. Aucoin's substantively flawed occupancy rates.

Sugar Hill apparently concedes the accuracy of Mr. Tatje's analysis. Sugar Hill's counsel engaged in little or no cross-examination of Mr. Tatje, see Tatje, Tr. 665-66, and little or no rebuttal of his testimony, see Tr. 675-77. Thus, the Court finds Mr. Tatje to be highly credible and, accordingly, must draw the unmistakable inference that Mr. Lavkold's appraisal is unreliable under Federal Rule of Evidence 702.

For these reasons, the Court must conclude that Sugar Hill has not established its entitlement to repair costs within the meaning of Dodge Street.

B. Sugar Hill's Lost Profits Claim

As shown below, Sugar Hill's lost profits claim is categorically non-compensable, speculative, and unsupported.

1. Sugar Hill's Lost Profits Claim Pertains to Categorically Non-Compensable Independent and Collateral Undertakings.

Damages for "profits [allegedly] lost on transactions not directly related to the contract that was breached" are categorically non-compensable. Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996). Thus, to determine whether a claim for lost profits is compensable, the Court must look to whether the profits "'would have accrued [and grown] out of the contract itself, as direct and immediate results of its fulfillment.'" Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1333 (Fed. Cir. 2003) (quoting Wells Fargo, 88 F.3d at 1023 (internal quotations omitted)). In other words, lost profits are compensable where "the only purpose of the contract . . . was for the plaintiff to make [those] profits on the subject of the contract." Wells Fargo, 88 F.3d at 1023. By contrast, if the profits "'would have been realized [by the party] from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract,'" then the claimed profits are non-compensable. Freedom NY, 329 F.3d at 1333 (quoting Wells Fargo, 88 F.3d at 1023 (internal quotations omitted)).

Here, Sugar Hill's own expert testified that Sugar Hill specifically developed the park for lease to FEMA, to house persons displaced by Hurricanes Katrina and Rita. See Lavkold, Tr. 555-56. In return, FEMA paid Sugar Hill rent at almost double the

prevailing market rate.  See id. at 564-66; Tatje, Tr. 658-59.  This exchange of emergency housing for premium rent payments was the primary purpose of the lease.  Accordingly, in light of Wells Fargo alone, Sugar Hill cannot recover on its lost profits claim.  See 88 F.3d at 1023 (noting that the disputed profits must be "the only purpose of the contract").

Moreover, Mr. Anderson testified at trial that (i) he wanted "flexibility from day one" and (ii) he "didn't know what [he] would have when FEMA left."  Anderson, Tr. 262-63.  Concerning the 111 Lots that remain unconverted to RV pads, Mr. Anderson commented that he wanted "the option to spend more money on concrete and make bigger lots" or, instead, to preserve them as "grunt worker spaces."  Id. at 264.  Thus, in entering the lease, Mr. Anderson expressly endeavored to preserve the requisite flexibility to embark upon "independent and collateral undertakings," at his option, upon the lease's expiration.  Under Freedom NY and Wells Fargo, lost profits pertaining to such undertakings are categorically non-compensable.

### 2. Sugar's Hill's Lost Profits Claim Is Impermissibly Speculative and Unsupported.

A breach-of-contract plaintiff seeking to recover lost profits must demonstrate (i) the foreseeability of the alleged profits; (ii) causation; and (iii) reasonable certainty as to the amount of its loss.  Energy Capital Corp. v. United States, 302 F.3d 1314, 1326 (Fed. Cir. 2002).  Here, Sugar Hill failed to demonstrate any of these three elements.

#### a. Foreseeability

Lost profits are foreseeable if the profits follow from the breach (i) "'in the ordinary course of events,'" or (ii) "'as a result of special circumstances . . . that the party in breach had reason to know.'"  Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 351(2) (1981)).  "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable."  Id. (quoting Restatement (Second) of Contracts § 351 cmt. a (1981)).

In 2006, Sugar Hill purchased three previously undeveloped parcels of land, which it combined to create the park.  JSOF ¶¶ 2-3.  Accordingly, the lands comprising the park never before had functioned as for-profit RV pads.

Furthermore, Mr. Anderson testified that he had no definitive plans, at the time Sugar Hill's lease to FEMA commenced, to develop RV pads upon the lease's expiration.  See Anderson, Tr. 262-63.  If Mr. Anderson had no definitive plans to develop RV pads, and the park never before had housed RV pads, then FEMA, certainly, could not have

foreseen Sugar Hill's subsequent development of RV pads. Sugar Hill's alleged lost profits, from the rental of RV pads, were not foreseeable.

  b.  Causation

  Sugar Hill has failed to demonstrate that FEMA's alleged breach of the parties' lease caused it to endure lost profits.

- Sugar Hill Did Not Demonstrate That FEMA's Alleged Breach Caused It to Delay the Conversion of Any Pads Between March 2008 and April 2009.

  Sugar Hill's lease to FEMA expired in March 2008. However, Sugar Hill did not begin converting the park's full-sized mobile home pads to smaller RV pads until April 2009. PPFOF ¶ 25; JSOF ¶ 28. Ultimately, Sugar Hill converted only 50 of the 161 total pads, and did not convert any pads after September 2010. See JSOF ¶¶ 48, 57.

  Between 2006 and 2008, Sugar Hill distributed $1,759,700 in dividends. See supra Background, Part E. In the view of Mr. McClellan, the Government's finance expert, Sugar Hill had sufficient capital, or access to capital, to convert all 161 pads in 2008. McClellan, Tr. 649-51. Indeed, at the end of 2009, Sugar Hill had approximately $1.2 million in owners' equity. Id. at 650. Accordingly, the Court finds that Sugar Hill had the financial capacity to begin the conversion process sooner, if market conditions had warranted.[12]

  Moreover, Mr. Anderson testified at trial that he "didn't know what [he] would have when FEMA left." Anderson, Tr. 263. More specifically, he explained that there are "different classes of . . . RVers." Id. at 260. "[G]runt workers" who "don't mind cutting [their] own grass" might "park right next to high-end travelers" who require concrete pads. Id.

  Mr. Anderson "wanted the flexibility from day one" to provide a mix of high-end and low-end pad-inventory. Id. at 261-62. Therefore, he exercised his business judgment to assess market conditions and make targeted upgrades to the grounds before converting too hastily.

  On these facts, the Court finds that FEMA was not the cause of Sugar Hill's delay in redeveloping the park, to house RV pads, between March 2008 and April 2009.

---

[12] At trial, Sugar Hill offered only minimal cross-examination of Mr. McClellan, see McClellan, Tr. 651-52, and did not offer any rebuttal of his testimony. As with Mr. Tatje, the Court finds Mr. McClellan to be highly credible.

- **Sugar Hill Did Not Demonstrate That FEMA's Alleged Breach Caused It to Delay the Conversion of the Remaining 111 Unconverted Pads.**

Similarly, the Court finds that Sugar Hill elected not to convert the remaining 111 pads because market conditions did not so warrant. Indeed, Sugar Hill experienced sustained occupancy rates below 50% in the months both before and after its last conversions in September 2010. See *supra* Background, Part F. With good reason, Mr. Anderson remarked at trial that he endeavored to preserve his "option," whether or not to convert the remaining pads, because "[y]ou still get money from them" even unconverted. Anderson, Tr. 264.[13]

c. Reasonable Certainty

Longstanding precedent precludes the award of speculative damages. Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931) (internal quotation omitted)). Therefore, absent tangible proof of specific damages, a plaintiff may not recover on its alleged injuries. Id. The "plaintiff must show that but for the breach, the damages alleged would not have been suffered." San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). Nevertheless, while this principal applies to the facial question of whether damages even were sustained, it does not bar recovery on proven injuries of imprecise or inexact measure. Roseburg Lumber, 978 F.2d at 668 (internal citations omitted). Put differently, damages must be reasonably certain, no more but no less.

Here, Sugar Hill proffered Mr. Aucoin's expert report as its exclusive evidence of lost profits. See PX 47. However, as with Mr. Lavkold's appraisal, the Court finds that Mr. Aucoin's report is unreliable under Federal Rule of Evidence 702.

It would be "an abuse of discretion" for a trial court "to permit a witness to testify as an expert . . . unless that witness is qualified as an expert in the pertinent art." Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1363 (Fed. Cir. 2008). "Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility" under Federal Rule of Evidence 702. Id. Here, Mr. Aucoin was unqualified to derive the occupancy rates used in his report, and relied upon unsound appraisal methodology.

---

[13] Notwithstanding the above analysis, a non-breaching party has an obligation "to mitigate damages which befall it during the periods both antedating and postdating the breach." Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005). Here, the Court wholly rejects Sugar Hill's claim for lost profits. However, even if the Court accepted Sugar Hill's claim, damages would be offset by (i) Sugar Hill's failure to initiate a timely conversion of mobile home pads to RV pads and (ii) Sugar Hill's failure to convert the remaining 111 pads.

Moreover, while "experts commonly extrapolate from existing data," "nothing . . . requires a [trial] court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap."  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).  Here, Mr. Aucoin's derived occupancy rates outright conflict with Sugar Hill's stipulated occupancy rates.

For the above reasons, Mr. Aucoin's report is unreliable under Federal Rule of Evidence 702.  Accordingly, Sugar Hill's lost profits claim, which exclusively relies upon Mr. Aucoin's report, is impermissibly speculative within the meaning of <u>Roseburg Lumber</u>.

To summarize, Sugar Hill has not established its entitlement to lost profits because its claim (i) is categorically non-compensable; and (ii) regardless, is impermissibly speculative and unsupported.

<u>CONCLUSION</u>

For the foregoing reasons, Sugar Hill failed to show its entitlement to any damages.  Therefore, the Court must DISMISS Sugar Hill's complaint.  The Clerk of Court is requested to enter judgment in favor of the Government.  No costs.

IT IS SO ORDERED.

<u>s/Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge